## UNITED STATES ex rel. CHICAGO, NEW YORK & BOSTON REFRIGERA-TOR CO. v. INTERSTATE COMMERCE COMMISSION.

(Court of Appeals of District of Columbia. Submitted January 2, 1923. Decided April 3, 1923.)

No. 3882.

1. **Railroads ⊕5½, New, vol. 6A Key-No. Series—Refrigerator car company held not "carrier by railroad," entitled to guaranty under Transportation Act.**

   A company which owned refrigerator cars, which it leased to railroad companies, and which at times solicited traffic and issued its own bills of lading, but which was not incorporated as a carrier, owned no railroad lines or motive power, and did not hold itself out to perform carriage by publishing rates applicable thereto, is not a "carrier by railroad," within Transportation Act 1920, § 209, guaranteeing a minimum return to such carriers for a six months period, especially in view of the fact that Congress deemed it necessary expressly to include sleeping car companies within the act, thereby implying that such companies were not otherwise covered by its terms.

2. **Carriers ⊕4—Failure to file tariffs tends to show refrigerator car company was not carrier.**

   While the failure of a refrigerator car company to file tariffs with the Interstate Commerce Commission is not proof that it is not a common carrier, it is evidence tending to show that it did not regard itself as such.

3. **Railroads ⊕5½, New, vol. 6A Key-No. Series—Only carrier by railroad entitled to guaranty under Transportation Act.**

   In Transportation Act 1920, § 209, subd. (a), defining carriers entitled to the guaranty prescribed by that act, the reference to systems of transportation under federal control at the time such control terminated cannot be considered apart from the words "carrier by railroad," which precede the former expression in the same sentence, and do not extend the guaranty to a refrigerator car company, which had been under federal control, but was not a carrier by railroad.

Appeal from the Supreme Court of the District of Columbia.

Petition for mandamus by the United States, on the relation of the Chicago, New York & Boston Refrigerator Company, against the Interstate Commerce Commission. From a judgment discharging the rule, and dismissing the petition, petitioner appeals. Affirmed.

Dan Thew Wright and William G. Wheeler, both of Washington, D. C., for appellant.

J. Carter Fort, of Washington, D. C., for appellee.

Before SMYTH, Chief Justice, ROBB, Associate Justice, and SMITH, Judge of the United States Court of Customs Appeals.

SMYTH, Chief Justice. Chicago, New York & Boston Refrigerator Company, for convenience designated herein as the Refrigerator Company, filed its petition in the Supreme Court of the District of Columbia for a mandamus directing the Interstate Commerce Commission to ascertain and certify to the Secretary of the Treasury of the United States the amounts necessary to make good to it the guaranty provided for carriers in section 209 of the Transportation Act of 1920

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

(41 Stat. 456). The petition alleged that the plaintiff had made application to the Commission for the certificate mentioned, but that it declined to issue it, on the ground that the Refrigerator Company was not a carrier within the meaning of the section. A rule to show cause was issued, to which the Commission responded by filing an answer. The Refrigerator Company traversed the answer and joined issue thereon. Much testimony was taken, but the facts are not in dispute. The court, approving the views of the Commission, discharged the rule and dismissed the petition. From this action the Refrigerator Company appeals.

The following are the pertinent provisions of section 209:

(a) When used in this section—

The term "carrier" means (1) a carrier by railroad or partly by railroad and partly by water, whose railroad or system of transportation is under federal control at the time federal control terminates, or which has heretofore engaged as a common carrier in general transportation and competed for traffic, or connected, with a railroad at any time under federal control; and (2) a sleeping car company whose system of transportation is under federal control at the time federal control terminates; but does not include a street or interurban electric railway not under federal control at the time federal control terminates, which has as its principal source of operating revenue urban, suburban, or interurban passenger traffic or sale of power, heat, and light, or both;

The term "guaranty period" means the six months beginning March 1, 1920,

The term "test period" means the three years ending June 30, 1917; and

The term "railway operating income" and other references to accounts of carriers by railroad shall, in the case of a sleeping car company, be construed as indicating the appropriate corresponding accounts in the accounting system prescribed by the Commission.

(b) This section shall not be applicable to any carrier which does not on or before March 15, 1920, file with the Commission a written statement that it accepts all the provisions of this section.

(c) the United States hereby guarantees—

(1) With respect to any carrier with which a contract (exclusive of so-called co-operative contracts or waivers) has been made fixing the amount of just compensation under the Federal Control Act, that the railway operating income of such carrier for the guaranty period as a whole shall not be less that one-half the amount named in such contract as annual compensation.

\* \* \* \* \* \* \* \* \* \*

(g) The Commission shall, as soon as practicable after the expiration of the guaranty period, ascertain and certify to the Secretary of the Treasury the several amounts necessary to make good the foregoing guaranty to each carrier. The Secretary of the Treasury is hereby authorized and directed thereupon to draw warrants in favor of each such carrier upon the Treasury of the United States, for the amount shown in such certificate as necessary to make good such guaranty. An amount sufficient to pay such warrants is hereby appropriated out of any money in the treasury not otherwise appropriated.

It is conceded that the Refrigerator Company is not a carrier partly by railroad and partly by water. The only question for decision is as to whether it is a "carrier by railroad." It appears that the company was incorporated to manufacture, sell, or rent freight cars, engines, and other rolling stock used in the operation of railroads, to manufacture and deal in any articles fabricated of wood, iron, or other metals, to deal in patents, to purchase and lease real

and personal estate, and to do any and all acts incidental to or connected with the business just described. The articles of incorporation do not say it was to become a carrier by railroad or otherwise. It owns 1,300 refrigerator cars, but does not own or control any motive power, roadbed, tracks, or other railroad property or facilities besides the cars. These cars are rented to certain railroad companies, and are used in the transportation of dairy products by the lessees from the West to the East. In addition to the rental which it receives from the railroad companies for its cars, certain railroad companies, pursuant to a contract between them and the Refrigerator Company, pay to the latter commissions for soliciting shipments which move over their lines in its cars. Shipments thus obtained move east of Chicago over the rails of the contracting railroad companies. No employés of the Refrigerator Company travel with its cars.

By contract between the Refrigerator Company and the railroads it is provided, inter alia, that the cars in the West are not to be loaded east-bound with local traffic "of the railways," nor in any way diverted from the established through routes without the consent of the Refrigerator Company, nor are they to be loaded with any freight that would render them unfit for the carriage of refrigerator traffic, and it is further provided that the cars shall be under the control of the railroads while on their respective lines, but that the directions of the Refrigerator Company as to the distribution at or west of Chicago shall be promptly observed.

The railroad companies make out in their own names bills of lading covering the shipments moving in the Refrigerator Company's cars, except that as to some shipments originating in the West and reconsigned at Chicago, which constitute about 10 per. cent. of all shipments in its cars, the Refrigerator Company issues bills of lading on its own forms at Chicago covering the movement east of that city. These bills of lading have printed on their faces the following language:

"Received subject to the classifications and tariffs in effect on the date of the issue of this original bill of lading."

This refers to the tariffs of the railroad companies. At times the Refrigerator Company collects prepaid freight charges on shipments moving from Chicago in its cars, but turns over the entire amount collected to the railroad companies. The Refrigerator Company also investigates and settles loss and damage claims in connection with shipments moving in its cars, but is reimbursed by the railroad companies for the entire amount paid in such settlements. Upon shipments moving in the cars of the Refrigerator Company, shippers pay freight charges to the railroad companies at the rates published and filed with the Commission by the railroad companies which transport such shipments. The Refrigerator Company receives no payment or compensation of any kind from the shippers for transportation service.

During the period of federal control, which lasted until March, 1920, the cars of the Refrigerator Company were used by the Director General of Railroads, and the Refrigerator Company was compensated by the United States for their use. At the expiration of federal con-

trol the cars were returned to the Refrigerator Company and it again let them to the railroad companies to be used as before. For their use it was paid by the companies the usual car rental. During the guaranty period—that is, the six months following federal control—its cars moved over the same routes as prior to federal control, but it received no commissions from the railroad companies for soliciting business, and did very little, if any, soliciting. An attempt was made by it to renew its commission arrangements, but the railroad companies would not consent. However, after the expiration of the guaranty period the commission arrangements were resumed.

The Refrigerator Company files no tariffs with the Commission, which common carriers by railroad engaged in interstate commerce are required to do by section 6 of the Interstate Commerce Act (Comp. St. § 8569), and it does not comply with the rules of the Commission with respect to the manner in which railroad companies shall keep their accounts. Many other things are mentioned in the testimony, but we think we have set forth all that has any bearing upon the question we are to decide.

[1] Summarized, the testimony shows that the Refrigerator Company is not incorporated as a carrier, does not control or use the necessary facilities for performing carriage, does not hold itself out to perform carriage by publishing rates applicable thereto, and does not in fact perform carriage, or receive any compensation from shippers whose shipments move in its cars. The cars are rented to railroad companies. They are subject to the control of the latter and are to all intents and purposes their property during the period of the lease. In a word, the Refrigerator Company carries nothing. Tacitly it admits this, but says that it causes freight to be carried. So do all shippers, but that does not make them carriers.

The phrase "carrier by railroad" as it appears in the Employers' Liability Act (Comp. St. §§ 8657–8665), was interpreted by the Supreme Court of the United States in Wells Fargo & Co. v. Taylor, 254 U. S. 175, 41 Sup. Ct. 93, 65 L. Ed. 205. Taylor contended that the express company was a carrier by railroad. The record disclosed that it conducted its business on and over a railroad, that the railroad company was to refrain from conducting any express business, and that the express company was supplied with portions of station houses to be used by it for the reception, safe-keeping, and delivery of express matter carried in cars supplied by the railroad company. It fixed its own rates, received the goods to be transported by it, cared for them in transit, delivered them to the consignees, and collected for the service rendered. The railroad company had nothing to do with these things, yet the court held that the express company, while a common carrier, was not a common carrier by railroad. It said that a carrier by railroad is one "who operates a railroad as a means of carrying for the public, that is to say, a railroad company acting as a common carrier," and added that this view was not only "in accord with the ordinary acceptation of the words, but is enforced by the mention of cars, engines, track, roadbed, and other property per-

taining to a going railroad, * * * by the use of similar words in closely related acts which apply only to carriers operating railroads, * * * and by the fact that similar words in the original Interstate Commerce Act had been construed as including carriers operating railroads but not express companies doing business as here shown." Decisions are cited in support of the ruling. 254 U. S. 187, 188, 41 Sup. Ct. 98 (65 L. Ed. 205). Following the reasoning of that case, we may say that the use of the term "railway operating income of such carrier," occurring in subdivision (1) of (c) of the section enforces the contention that the Refrigerator Company is not a carrier by railroad. Its income cannot be spoken of correctly as a railway operating income. Congress, as the section shows, found it necessary to give the term a special construction for the purpose of applying it to sleeping car companies. It would need a like construction by Congress before it could be applied to the Refrigerator Company. The court has no power to supply what Congress omitted.

It is said that the definition of the term "common carrier by railroad," given in the Taylor Case, was limited to the act then being construed. This, of course, is true; but we think that, if the express company under the circumstances disclosed was not a carrier by railroad, neither is the Refrigerator Company. The reasoning of the opinion compels this result.

Another case which we think is quite in point is that of Ellis v. Interstate Commerce Commission, 237 U. S. 434, 35 Sup. Ct. 645, 59 L. Ed. 1036. We learn from the opinion that the Armour Car Lines, a New Jersey corporation, owned, manufactured, and maintained refrigerator, tank, and box cars, and let the cars to the railroads or to shippers. It owned and operated icing stations on various lines of railroad, and from these it iced and re-iced the cars when set by the railroad companies at the icing plant. The railroads paid a certain rate per ton and charged the shippers according to tariffs on file with the Commission. The corporation had no control over motive power or over the movements of the cars that it furnished. The court held it was not a common carrier subject to the Act to Regulate Commerce. We are unable to see why the ruling in that case should not be applied to the one before us.

The Refrigerator Company calls attention to the fact that it solicited business to be transported by rail, that it had a trained organization by which the shippers were kept in direct personal contact with it, that they were advised by this special organization as to the best manner and method of preparing, packing, and handling this class of traffic, and that the shippers who dealt with it knew no other carrier and had no other in mind. But all these things can be said with equal force of an express company, and yet, as we have seen, it is not a common carrier by rail. Not only may these things be said of an express company, but also of sleeping car companies, but Congress did not think the latter were carriers by rail, for it provided specifically for them in section 209, and this it would not have done, if it believed they were included in the phrase "carrier by railroad." The Refrigerator Company seeks to escape the force of this fact by saying that sleeping

car companies have never been considered as common carriers by railroad; but that is not the question. If the facts upon which it relies establish that it is a common carrier by railroad, then they should, by a parity of reasoning, establish that the sleeping car companies are also carriers by railroad. Perhaps Congress should have included the Refrigerator Company and like companies, but we are not concerned about what it should have done, but about what it did do.

[2, 3] With respect to the claim that the Refrigerator Company did not file tariffs with the Interstate Commerce Commission, counsel say that this is not proof that it was not a common carrier. No; but it tends to show that the Refrigerator Company did not regard itself as such. Emphasis is laid by counsel upon the phrase "whose railroad or system of transportation is under federal control at the time federal control terminates," which occurs in subdivision (a) of section 209. They argue that the company owned a system of transportation at the time mentioned. We do not think so. But, however that may be, this phrase cannot be considered apart from the words which precede it in the same sentence. The organization entitled to the guaranty must be a carrier by railroad or partly by railroad and partly by water. If it is not, the fact that it may be a system of transportation would not bring it within the purview of the guaranty.

For the reasons given, the judgment of the lower court is affirmed with costs.

Affirmed.

Motion for writ of error to United States Supreme Court allowed April 7, 1923.